510 F.2d 464
 Gary L. POINDEXTER, Appellant,
v.
Robert N. WOODSON et al., Appellees.
James Mearl SHARP, Appellant,
v.
Robert N. WOODSON et al., Appellees.
Samuel Ross BROOKS, Appellant,
v.
Robert N. WOODSON et al., Appellees.
Ray Charles TURNER, Appellant,
v.
Robert N. WOODSON et al., Appellees.
David Thomas KOWALEC, Appellant,
v.
Robert N. WOODSON et al., Appellees.
 No. 73--1532.
 United States Court of Appeals,
Tenth Circuit.
 Argued Oct. 23, 1974.
Decided Feb. 4, 1975.
 
 Malcolm E. Wheeler, of Hughes, Hubbard & Reed, Los Angeles, Cal. (Ronald L. Roseman, Kansas City, Mo., and Dwight Henderson, Wyandotte County Legal Aid Society, Kansas City, Kan., with him on the brief), for appellants.
 Kenneth F. Crockett, Sp. Asst. Atty. Gen. (Vern Miller, Atty. Gen., with him on the brief), for appellees.
 Before SETH, BARRETT and DOYLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 These several cases were consolidated for trial. They were brought under the Civil Rights Act seeking injunctive relief and damages. The plaintiffs were, at the time the incidents took place, inmates of the Kansas State Penitentiary. The defendants were then officials in the state penal system.
 
 
 2
 The incidents which were alleged to have constituted cruel and unusual punishment in violation of the Eighth Amendment were exposure to tear gas while confined in cells, being sprayed with water hoses, and confinement in solitary facilities and in 'strip cells.' The memorandum of the trial court describes the general prison conditions prevailing at the time, the serious riot which started at the prison in June with the destruction of cell houses and other facilities, the inmate control of certain cell houses thereafter, and other problems which continued after the riot for a considerable period of time. After the height of the riot, plaintiffs were confined in a separate facility at the prison known as the A and T which was designed for maximum security and segregation. This confinement was for charges growing out of the riot. Conditions at the prison had not returned to normal, and at the A and T facility, there were serious disturbances on August 27th. After several hours, the turmoil was growing worse, and all the inmates there, including the plaintiffs, were then tear gassed and sprayed with hoses to stop the disturbances. The tear gassing was severe, and had a residual effect.
 
 
 3
 The strip cells in which the plaintiffs were confined were about 9 by 5 feet in size, concrete floors, no windows, a floor drain, no toilets or wash basins, and no bunks. The prisoners were confined without clothing, pads or blankets, and thus slept on the bare floor. They received the prison food on paper plates and water in paper cups. There were furnished no supplies for personal hygiene or cleanliness. As indicated above, some months after the general riot, the plaintiffs were placed in the strip cells on several occasions for various periods of time. Plaintiff Kowalec was there confined for six days in September; plaintiff Poindexter for about two weeks in September; plaintiff Brooks from January 13th to February 17th; plaintiff Turner sixteen days in February, and plaintiff Sharp for four days in February.
 
 
 4
 The trial court found that the use of tear gas and water was not cruel and unusual punishment, but was necessary force to control the disruption. It held, however, that the use of the strip cells was contrary to the Eighth Amendment. The court ruled that no injunction should issue because the use of the cells had stopped and they had been welded shut. This fact was considered with the testimony of the new prison officials that use of the cells was unnecessary, and on what the court considered to be a good faith effort to remedy the situation. The trial court also held the defendants were not liable for money damages.
 
 
 5
 The record shows that the strip cells were part of a structure built at the Kansas prison about 1956. The design was obviously authorized by the appropriate authorities, and the trial court concluded that the use of these cells so built was authorized under Kansas statutes. K.S.A. § 76--2423. The trial court found that no court with jurisdiction over the defendants had ever held that the use of the cells constituted cruel and unusual punishment. The cells were thus a part of the state's system of punishment and discipline, and had been for many years. Such cells were apparently fairly common in other states, as indicated in the reported decisions. See Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.); and Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.).
 
 
 6
 The Supreme Court, as long ago as Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, indicated that the concept of 'cruel and unusual punishment' must undergo change as the community standards and conscience change. Any cursory consideration of the historical changes in the nature of punishment for criminal offenses will demonstrate the wide fluctuations in severity and character. What may be considered cruel and unusual today was deserved and usual not too long ago. In this context, the use of devices and punishments at the moment of a declared change in characterization of them from usual to unusual places the prison officials in the same position as the police officers in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, where the statute was declared unconstitutional. The Court there said:
 
 
 7
 'A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied.'
 
 
 8
 and also held:
 
 
 9
 'We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983.'
 
 
 10
 The situation of the prison officials in using the strip cell provided by the state and authorized by state law is thus within the holding of Pierson v. Ray.
 
 
 11
 The Supreme Court in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, considered the varying scope of qualified immunity in a broader context than Pierson v. Ray, and held:
 
 
 12
 'These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of Government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords basis for qualified immunity of executive officers for acts performed in the course of official conduct.'
 
 
 13
 The combination of scope of discretion with reasonable grounds for belief and good faith belief in the circumstances as they 'reasonably' appeared at the time of the action is the expressed mix of factors. Scheuer v. Rhodes is a significant indicator of the good faith--reasonable grounds application to executive branch officials of a state. See also the similar factors of discretion and malice--good-faith in Smith v. Losee, 485 F.2d 334 (10th Cir.), and Williams v. Eaton, 443 F.2d 422 (10th Cir.). The consideration of the official's evaluation of the situation facing them is equally important to the consideration of the case before us.
 
 
 14
 The incidents in issue took place after the riots at the prison, but during a time, and at a place, where the repercussions were still felt. This factor and the absence of normal prison conditions was part of the 'circumstances' facing the prison officials as referred to in Scheuer.
 
 
 15
 We have carefully examined the record and the findings relating to the use of tear gas and fire hoses as control measures during periods of disruption at the prison. It is sufficient to state that the findings and conclusions of the trial court are supported by the record and the applicable authorities. Adequate consideration was given to the circumstances prevailing at the time, to the events which had transpired shortly before, and to the discretion vested in the officials. See Bethea v. Crouse, 417 F.2d 504 (10th Cir.).
 
 
 16
 The trial court's findings show the absence of any malice on the part of defendants. The trial court permitted the plaintiffs to amend their pleadings to assert personal claims against the defendants, and allowed the defendants to amend to raise the defense of immunity. Each amendment was made for the reason that the case had been so tried. The trial court was thus correct in its application of qualified immunity, and in refusing to award damages. There was no error in its refusal to enjoin for the reasons it described. See Knuckles v. Prasse, 302 F.Supp. 1036, aff'd 435 F.2d 1255 (3d Cir.).
 
 
 17
 In view of this consideration of the issues, we have not examined the issue of respondeat superior as it might here apply, but instead note it as an unresolved problem in this case.
 
 
 18
 Affirmed.
 
 
 19
 WILLIAM E. DOYLE, Circuit Judge (dissenting).
 
 
 20
 Because I disagree with the majority determination that immunity can be invoked in the present circumstances, I respectfully dissent.
 
 
 21
 The trial court's findings treat the facts in some detail, and from these we realize the impact of the conduct. The conscience of the trial court was shocked by it. Notwithstanding this, immunity was extended by the trial court and is extended by this court to the officials. This is based on the fact that the Attorney General had never told them that subjection of inmates to this treatment was a violation of the Constitution of the United States.
 
 
 22
 In my judgment it was not necessary to so advise them. Suppose the rack and screw were being employed pursuant to state law or custom. Would the officers be allowed to claim good faith because of a mistaken belief that the law allowed it? I submit not.
 
 
 23
 Furthermore, the statute relied on, K.S.A. 76--2423, does not come near to authorizing the strip cell.[1] True, it allows the imposition of solitary confinement and distress, but this falls short of prescribing the strip cell in all of its indignity.
 
 
 24
 I disagree with the majority opinion that the Supreme Court's decision in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) is relevant authority for the majority decision. That case emphasized the necessity for 'reasonable grounds for the belief formed at the time and in light of all the circumstances * * *.'
 
 
 25
 None of our prior decisions, including Smith v. Losee, 485 F.2d 334 (10th Cir. 1973), support the present decision. See also Dearman v. Woodson, 429 F.2d 1288 (10th Cir. 1970). Cf. Bethea v. Crouse, 417 F.2d 504 (10th Cir. 1969). In Bethea the Kansas Penitentiary and the Kansas authorities were named. There the allegation was that the warden and deputy warden stood by while a fellow inmate inflicted beatings of an extreme nature on the two plaintiffs. The court held that it was error to grant summary judgment.
 
 
 26
 The Court of Appeals for the Second Circuit has treated a case which is very similar to ours involving as it does strip cells. I refer to Wright v. McMann, 460 F.2d 126 (2d Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). The court there affirmed an award of damages against the warden in the amount of $1500.00 based on violation of the Eighth Amendment. The trial court had refused the defense of good faith and this action was approved by the appeals court.
 
 
 27
 Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) does not extend immunity based on good faith to a clear-cut violation of the Eighth Amendment--one which shocks the conscience. That was an arrest and confinement situation arising under the Fourth Amendment and depending on the quantum of evidence of probable cause. No such factual evaluation is necessary here. Rather, the stark facts are brought home and the action is so excessive that it could not create the mistaken belief that it is legal. In final analysis this is the reason for my disagreement with my brothers.
 
 
 
 [1]
 From a reading of the statute one could not conclude that it allows enforced nudity, lack of any toilet facilities excepting a hole in the floor, and a concrete floor without beds or bedding. This is far different from solitary confinement with deprivation of light and production of distress